**\*NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN SKLAR, on behalf of himself and all others similarly situated,<br><br>                   Plaintiff,<br><br>    vs.<br><br>AMARIN CORPORATION PLC and JOSEPH S. ZAKRZEWSKI,<br><br>                 Defendants. | Civil Action No. 13-cv-06663 (FLW) (TJB)<br><br><u>CLASS ACTION</u> |
| JODI SIEGEL and JODI SIEGEL, IRA, Individually And On Behalf of All Others Similarly Situated,<br>                 Plaintiffs,<br><br>    vs.<br><br>AMARIN CORPORATION PLC, JOSEPH S. ZAKRZEWSKI, JOHN F. THERO,<br>                 Defendants. | Civil Action No. 13-cv-07210 (FLW) (TJB)<br><br><u>CLASS ACTION</u> |
| JOSEPH A. BOVE and JOSEPH J. BOVE, Individually And On Behalf of All Others Similarly Situated,<br>                 Plaintiffs,<br><br>    vs.<br><br>AMARIN CORPORATION PLC, JOSEPH S. ZAKRZEWSKI, JOHN F. THERO, and STEVEN B. KETCHUM,<br><br>                 Defendants. | Civil Action No. 13-cv-07793 (FLW) (TJB)<br><br><u>CLASS ACTION</u> |

| | |
|---|---|
| ADAM BENTLEY, Individually And On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>AMARIN CORPORATION PLC, and JOSEPH S. ZAKRZEWSKI,<br><br>    Defendants. | Civil Action No. 13-cv-07794 (FLW) (TJB)<br><br>CLASS ACTION<br><br>OPINION |

**WOLFSON, United States District Judge:**

Presently before the Court are four securities fraud putative class actions brought against Amarin Corporation PLC ("Amarin"), and Joseph S. Zakrzewski, John F. Thero and Steven B. Ketchum (collectively, "Defendants"). Plaintiffs in the proposed class are shareholders who allege that from July 9, 2009 through October 15, 2013 (the "Class Period"), Defendants artificially inflated the price of Amarin American Depository Receipts ("ADRs") in violation of § 10(b) the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and § 20(a) of the Exchange Act, 15 U.S.C § 78t(a). Before the Court are several motions pursuant to § 21D(a)(3)(B) of the Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), filed by various putative class members to (i) consolidate the proceedings, (ii) appoint that member as lead plaintiff, and (iii) approve that member's selection of lead counsel for the class. For the reasons stated on the record on July 24, 2014, and those additional reasons stated herein, the Court (i) consolidates the four actions, (ii) appoints James F. Reiss ("Reiss") as lead plaintiff, and (iii) appoints Wolf Popper LLP as lead counsel, and Cohn, Lifland, Pearlman, Herrmann, & Knopf LLP as liaison counsel.

I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are taken from the pleadings and are accepted as true solely for the purposes of deciding the instant motions.  Amarin is a British biopharmaceutical company focused on the commercialization and development of therapeutics to improve cardiovascular health, whose ADRs trade on the NASDAQ under the ticker symbol "AMRN".  Sklar Compl., ¶¶ 9-10. On July 26, 2012, Amarin received approval from the U.S. Food and Drug Administration (the "FDA") to market and sell Vascepa capsules, its lead product, as an adjunct to diet to reduce triglyceride ("TG") levels in adult patients with severe hypertriglyceridemia (TG $\geq$ 500mg/dL). Id. at ¶ 18.  This indication for Vascepa is referred to as the MARINE indication.  Id.  Vascepa has been available by prescription for the MARINE indication since January 2013.  Id. at ¶ 20.

While Amarin was developing Vascepa for the MARINE indication, it was also developing Vascepa for the treatment of patients with high TG levels (200mg/dL $\leq$ TG $\leq$ 500mg/dL) who are also on statin therapy for elevated low-density lipoprotein cholesterol levels, or LDL-C levels, which is referred to as mixed dyslipidemia.  Id. at ¶ 21.  This indication for Vascepa is referred to as the ANCHOR indication.  Id. at ¶ 22.  According to Amarin's Form 10-K for fiscal year 2012, the market for the ANCHOR indication is approximately ten times larger than the market for the MARINE indication.  Id. at ¶ 23.  However, it would cost over $100 million to conduct an outcomes study of the ANCHOR indication.  Id. at ¶ 25.  Accordingly, Amarin's future profitability was dependent on not only getting approval to market Vacepa for the ANCHOR indication, but also getting that approval without having to complete an outcomes study.  Id. at ¶ 26.

A smaller study of the ANCHOR indication, the ANCHOR Study, was a 12-week test of approximately 700 patients to determine if administration of Vascepa to the patient population

3

reduces TG.  Id. at ¶ 22.  In July 2008, Amarin met with the FDA to discuss the ANCHOR study and whether Amarin would be required, prior to FDA approval of the ANCHOR indication, to complete an outcomes study to determine whether Vascepa was effective in reducing major cardiovascular events in the ANCHOR population.  Id. at ¶ 27.  The FDA informed Amarin that "there was a lack of prospective, controlled clinical trial data demonstrating that pharmaceutical reduction of non-HDL-C (or TG) with a second drug, in patients with elevated TG levels at LDL goal on statin therapy, significantly reduces residual cardiovascular risk."  Id. at ¶ 28.  The FDA informed Amarin that the results of two pending trials, AIM-HIGH and ACCORD-Lipid, would be significant indicators on the benefit of adding a lipid-active drug to patients already receiving statin therapy.  Id.

In December 2011, Amarin announced that it was conducting a multi-year $100 million outcomes study, titled REDUCE-IT (Reduction of Cardiovascular Events with EPA- Intervention Trial), of Vascepa's efficacy in reducing major cardiovascular events in a high risk population on statin therapy, the same patient population in the ANCHOR indication.  Id. at ¶¶ 22, 25.  By virtue of their 2008 meeting with the FDA, Amarin knew that the FDA was unlikely to approve Vascepa for the ANCHOR indication in the absence of the REDUCE-IT study, and without such an outcomes study, the FDA would look to the AIM-HIGH and ACCORD-Lipid studies as indicative of whether the reduction in TGs had been scientifically proven to diminish the incidence of severe cardiovascular events.  Id. at ¶ 29, 65.

Throughout the Class Period, Amarin informed investors that, pursuant to a special protocol assessment agreement between Amarin and the FDA, the FDA would approve Vascepa based only on the ANCHOR protocol, so long as the REDUCE-IT study was "substantially underway."  Id. at ¶ 30.  Amarin ultimately clarified that the agreement only specified that the

FDA would accept a new drug application—rather than approve Vascepa—for the ANCHOR indication if the REDUCE-IT study was "substantially underway." Id. at ¶ 31. However, Amarin did not disclose that the FDA had also expressed reservations about approving Vascepa in the absence of the completion of an outcomes study such as REDUCE-IT, especially if the AIM-HIGH and ACCORD-Lipid studies were unsuccessful in demonstrating a reduction in major cardiovascular events, as they ultimately were. Id.

On October 16, 2013, the FDA Advisory Committee was scheduled to consider Amarin's new drug application based on the ANCHOR study. Id. at ¶ 60. Prior to this meeting, on October 11, 2013, the FDA published its briefing document for the October 16, 2013 Advisory Committee Meeting. Id. at ¶ 58. That briefing document summarized the FDA's significant doubt, expressed to Amarin in July 2008, that reduction of triglycerides alone evidenced an improved risk of cardiac issues, and the FDA stated that based on published test results of AIM-HIGH, ACCORD-Lipid, and a third study named HPS2-THRIVE, there was little indication that a reduction in TGs alone would improve the incidence of cardiac events. Id. As a result of this news, Amarin's stock prices declined by $1.38 per share on October 11, 2013, dropping from $6.37 to $5.09. Id. at ¶ 59.

On October 16, 2013, the NASD halted trading in Amarin while the Advisory Committee considered Amarin's new drug application based on the ANCHOR study. Id. at ¶ 60. The FDA presenter emphasized at the Advisory Committee meeting that Amarin was advised by the FDA in July 2008, with respect to the application for approval of the ANCHOR indication based only on the ANCHOR study, that "ongoing cardiovascular outcomes trials—e.g., ACCORD-Lipid and AIM-HIGH—would provide important information on the incremental benefit of adding a second lipid-altering drug to statin therapy. Id. at ¶ 60. After hearing testimony and deliberating Amarin's application, the Advisory Committee rejected the new drug application for the ANCHOR

indication, adopting the FDA's position that the ANCHOR study itself was not indicative of the efficacy of the drug to reduce severe cardiovascular events, and that the FDA should wait for the completion of the REDUCE-IT study before approving Vascepa for the ANCHOR indication. Id. at ¶ 61. Upon the resumption of trading on October 17, 2013, Amarin common stock declined by another $3.16 per share, dropping from $5.17 to $2.01 per share. Id. at ¶ 62.

On October 29, 2013, Amarin filed a Form 8-K with the SEC. The Form 8-K informed investors that the FDA had "rescinded the ANCHOR study special protocol assessment agreement." Id. at ¶ 63. According to the Form 8-K, "the FDA cited results from the ACCORD-Lipid and AIM-HIGH outcome trials, as well as the publicly presented results from the HPS2-THRIVE outcome trial, which the FDA stated in its October 29, 2013 notice to Amarin, failed to support the hypothesis that a TG-lowering drug significantly reduces the risk for cardiovascular events among statin-treated patients with mixed dyslipidemia and residually high serum TG levels (200-499mg/dL). Id. at ¶ 63. The grounds for suspension of the special protocol assessment agreement were the same grounds that Amarin was apprised of by the FDA at the pre-new drug application meeting in July 2008, namely that it would require the completion of the REDUCE-IT outcomes study prior to approval of the ANCHOR indication. Id. at ¶ 64.

On November 1, 2013, Plaintiff Steven Sklar ("Sklar") filed an action in this Court (the "Sklar Action"), on behalf of a class of investors who purchased Amarin ADRs from July 9, 2009 through October 15, 2013, against Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 20(a) of the Exchange Act. Counsel for Sklar published a notice of pendency of the action via PRNewswire on November 4, 2013. Similar actions were filed shortly after. On November 5, 2013, Plaintiffs Joseph A. Bove and Joseph J. Bove filed a complaint in the Southern District of New York (the "Bove Action") for purchasers of Amarin

securities between August 8, 2012 and October 16, 2013.  On November 20, 2013, Plaintiff Adam

Bentley also filed a complaint in the Southern District of New York (the "Bentley Action") on

behalf of purchasers of Amarin securities from July 9, 2009 through October 16, 2013.  On

November 27, 2013, Plaintiff Jodi Siegel filed a complaint in this Court on behalf of purchasers

of Amarin ADRs from July 9, 2009 through October 15, 2013 (the "Siegel" Action).

On December 5, 2013, the parties to the Bove Action and the Bentley Action stipulated to

transfer those cases to this Court as being related to the Sklar Action, and on December 9, 2013,

an order was entered transferring those two actions to this Court.  Within the four actions, motions

for consolidation, appointment of lead plaintiff, and appointment of lead counsel were

subsequently filed by, inter alia, (i) Reiss; (ii) Mojtaba Mirsalimi; (iii) Dr. Robert J. Blumenthal.

Although these three movants fully briefed their own motions, and opposed their co-movants'

motions, on the day the Court held oral argument on the matter, July 24, 2014, counsel for

Blumenthal informed the Court that it was withdrawing its motion.  Accordingly, this Court finds

that Reiss and Mirsalimi, the proposed lead plaintiffs with the largest financial losses, are the

clearest choices for the lead plaintiff.  Furthermore, the other movants have either withdrawn their

motions, conceded that Reiss or Mirsalimi would be the most appropriate lead plaintiff, or

abandoned their motions by not otherwise filed any additional papers indicating any opposition.[1]

Accordingly, I limit my analysis to Reiss and Mirsalimi.

---

[1]     Other similar motions were filed by (i) Deka International S.A. Luxembourg, Matt Keil,
Anthony Scheiger, the Tomorrow Group LLC, and Richard Zecher (collectively, the "Amarin
Investors Group"); (ii) Henry Cooperman; (iii) Jay Heit; (iv) Shaun McCracken; (v) Michael
Peacock and Randall Riggs (collectively, the "Peacock Group); (vi) Richard Joy; and (vii) William
Gregory, Abraham Slomovics, and Vimal Gandhi (collectively, the "Gregory Group").   On
January 7, 2014, the Peacock Group withdrew its motion to be appointed lead plaintiff.  On January
15, 2014, Richard Joy withdrew his motion to be appointed lead plaintiff.  On January 21, 2014
the Gregory Group submitted a response conceding that Reiss would be the most appropriate lead
plaintiff.  Of the remaining movants, only Reiss, Mirsalimi, and Blumenthal have filed additional

## II.     APPLICABLE LAW

The PSLRA governs the appointment of the lead plaintiff in "each private action arising under the [Exchange Act] that is brought as a plaintiff class action pursuance to the Federal Rules of Civil Procedure."  15 U.S.C. § 78u-4(a)(3)(B)(iii).  Under the PSLRA, the plaintiff who files the initial action must, within 20 days of filing the complaint, publish notice to the class informing class members of the pendency of the action, the claims asserted in the complaint, the class period, and their right to serve as lead plaintiff.  Id., § 78u-4(a)(3)(A)(i).  Within 60 days of the publication of the notice, any putative class member may move the court for appointment to serve as lead plaintiff.  Id., § 78u-4(a)(3)(A)(i)(ii).  Within 90 days of the publication of the notice, the court must consider any motion made by a purported class member, and appoint as lead plaintiff the member or members that the Court determines to be most capable of adequately representing the interests of the class members.  Id., § 78u-4(a)(3)(B)(i).

The PSLRA establishes a rebuttable presumption that the "most adequate plaintiff" is the person or group of persons that has filed the complaint or made a motion in response to the notice to the class; has the largest financial interest in the relief sought by the class; and otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  With regard to determining the plaintiff with the "largest financial interest", the Third Circuit has held that "district courts should consider, among other things: (1) the number of shares that the movant purchased during the putative class period; (2) the total net funds expended by the plaintiffs during the class period; and (3) the approximate losses suffered by the plaintiffs."  In re Cendant Corp. Litig., 264 F.3d 201, 262 (3d Cir. 2001).

---

papers in support of their motions and in opposition to competing motions.  However, the Gregory Group offers that it is ready and able to serve as lead plaintiff in the future of this action if necessary.

The Third Circuit has also held that the determination of whether the movant with the largest interest in the case otherwise satisfies Rule 23 "should be confined to determining whether the movant has made a prima facie showing of typicality and adequacy." Id. at 263. In deciding whether the movant has preliminarily satisfied the typicality requirement, "courts should consider whether the circumstances of the movant with the largest losses 'are markedly different or the legal theory upon which the claims [of that movant] are based differ[] from that upon which the claims of the other class members will perforce be based.'" Id. at 265 (citing Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)). In making the threshold adequacy assessment, the court should consider whether the movant "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class." In re Cendant Corp. Litig., 264 F.3d at 265 (citing Hassine, 846 F.2d at 179).

The presumption of "most adequate plaintiff" may be rebutted upon proof by a member of the purported class that the presumptively most adequate plaintiff will not fairly and adequately protect the interests of the class or is subject to unique defenses that render such plaintiff incapable of adequately representing the class.[2]   15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). If a class member succeeds in rebutting the presumption, then the court begins the process anew by identifying which of the remaining movants has the highest financial interest, assessing whether that movant satisfies the threshold typicality and adequacy requirements, and determining whether the presumption has been rebutted, until a lead plaintiff is selected. Id. at 268.

---

[2]     The Third Circuit has held that in general, "[a] proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." Beck v. Maximus, Inc., 457 F.3d 291, 301 (3d Cir. 2006).

### III.   DISCUSSION

### A.   Motion to Consolidate

Rule 42(a) of the Federal Rules of Civil Procedure ("Rule 42(a)") provides:

When actions involving common questions of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed.R.Civ.P. 42(a); see also Nanavati v. Burdette Tomlin Memorial Hosp., 857 F.2d 96, 103 n.3 (3d Cir.1988) (consolidation is appropriate where there are actions involving common questions of law or fact); Fields v. Biomatrix, Inc., 198 F.R.D. 451, 454 (D.N.J. 2000) (same) (citations omitted); Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp., 149 F.R.D. 65, 80 (D.N.J. 1993) ("Rule 42(a) gives the [D]istrict [C]ourt 'broad powers to consolidate actions involving common questions of law or fact if, in its discretion, such consolidation would facilitate the administration of justice.' "). The PSLRA, moreover, directs that cases should be consolidated where there is "more than one action on behalf of a class asserting substantially the same claim or claims." 15 U.S.C. § 78u–4(a)(3)(B)(ii).

Here, the four actions—Sklar, Siegel, Bove, and Bentley—all involve the same issues of law and fact, and indeed, each assert substantially the same claims. Moreover, no one disputes that consolidation is appropriate. Accordingly, I find that these four matters should be consolidated.

### B.   Lead Plaintiff

As noted above, the PSLRA lays out detailed procedures for courts to follow in making the decision to appoint a lead plaintiff, directing them to appoint "the most adequate plaintiff" as the lead plaintiff, and instructing them to "adopt a presumption" that the most adequate plaintiff is the movant that "has the largest financial interest in the relief sought by the class" and "otherwise

satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." In re Cendant Corp.

Litig., 264 F.3d at 263 (quoting 15 U.S.C. § 78u–4(a)(3)(B)(i) & (iii)(I)). The presumption "may

be rebutted only upon proof by a member of the purported plaintiff class that the presumptively

most adequate plaintiff will not fairly and adequately protect the interests of the class or is subject

to unique defenses that render such plaintiff incapable of adequately representing the class." Id. §

78u–4(a)(3)(B)(iii)(II).

Here, it is not disputed that Reiss has the largest financial interest. In support of his motion

to be appointed lead plaintiff, Reiss argues that during the Class Period he acquired over 3.8 million

Amarin ADRs, holding 685,000 ADRs at the end of the class period, and suffered losses of

$7,991,345 as a result of Defendants' alleged misconduct—undisputedly more than any other

movant. Reiss has also provided a sworn declaration with a lengthy table of his transactions in

Amarin securities during the class period and the resulting losses. See Reiss Decl., Ex. A. By

comparison, Mirsalimi has reported a loss of $1,832,038 with 390,000 ADRs held at the end of

the Class Period. Thus, I find that, Reiss is the movant with the largest financial interest, and

Mirsalimi has the second largest financial interest.[3] Accordingly, I turn to whether Reiss meets

the requirements of Rule 23.

---

[3]       Mirsalimi argues that Reiss bought and sold over 3.2 million shares prior to the October 11, 2013 disclosure. As a result, Mirsalimi contends, Reiss' losses are inflated, and his actual losses as a result of Defendants' alleged misconduct are at most $2.9 million. Reiss replies by correctly noting that he has suffered both the largest total losses and losses attributable to the stock price drops of October 11 and 17, 2013, and thus has the largest financial interest in this action. Specifically, both his $7,991,345 in total losses and approximately $2.9 million in losses attributable to the stock price drops of October 11 and 17, 2013 are greater than the $1,832,038 loss reported by Mirsalimi. Moreover, in addition to having the largest approximate losses suffered, Reiss is also the movant with the largest number of shares purchased during the class period and the largest total net funds expended during the class period.

The Rule 23 inquiry focuses on the "typicality" and "adequacy" requirements at this stage of the litigation, and only a preliminary showing of both typicality and adequacy is necessary.  In re Cendant Corp. Litig., 264 F.3d at 263.  To meet the "typicality" requirement, a plaintiff s claims must arise from the same conduct from which the other class members' claims and injuries arise; the "adequacy" requirement is satisfied when there is no conflict between the proposed lead plaintiff and members of the class, and the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy.  Id.

Initially, I must determine whether Reiss has established a prima facie case for typicality and adequacy.  Id.  This threshold determination of whether the movant with the largest financial losses satisfies the typicality and adequacy requirements should be a product of the court's independent judgment, and arguments by members of the purported plaintiff class as to why it does not should be considered only in the context of assessing whether the presumption has been rebutted.  Id. at 263-64.  Here, I find that Reiss has made a prima facie showing that he satisfies the typicality requirement of Rule 23 because his claim arises from the same conduct from which the other class members' claims and injuries arise.  Similarly, I find that Reiss has made a prima facie showing that he is the most adequate plaintiff because he has shown that he has a strong interest in litigating this case—given the amount of his losses and size of his holdings—and there is nothing to indicate any conflict between Reiss and the other members of the proposed class.  See id. at 265 (in assessing whether the movant satisfies Rule 23's adequacy requirement, courts should consider whether the movant "has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf of the class.").

I turn next to whether any of the other plaintiffs—namely, Mirsalimi—have rebutted Reiss'

prima facie showing.  Mirsalimi objects to Reiss' satisfaction of the "typicality" and "adequacy"

requirements.  Specifically, Mirsalimi argues that Reiss is not entitled to be lead plaintiff because

he is a day trader, and thus is atypical of the class and an inadequate representative because he is

susceptible to the unique defense that he was trading in response to information other than the

alleged misstatements and omissions made by Amarin.[4]  Mirsalimi also argues that the

presumption of lead plaintiff is further rebutted as to Reiss because he is an "in and out" trader—

one who sold his shares prior to any corrective disclosure—and thus atypical of the class and

subject to a unique defense on loss causation grounds.  See In re IMAX Sec. Litig., 272 F.R.D.

138, 147 (S.D.N.Y. 2010); see also In re Flag Telecom Holdings, Ltd. Secs. Litig., 574 F.3d 29,

34 (2d Cir. 2009); In re Bally Total Fitness Secs. Litig., 2005 WL 627960, at *6 (N.D. Ill. March

15, 2005).  I address these arguments in turn.

In support of his claim that Reiss is a day trader, Mirsalimi argues that Reiss engaged in

4,565 purchases and sales of Amarin securities throughout the class period, with as many as 117

transactions on a particular day.  In that regard, Mirsalimi maintains that Reiss engaged in an

---

[4]      Reliance on misstatements, including material omissions, is an element of a cause of action
under Rule 10b–5.  Basic, Inc. v. Levinson, 485 U.S. 224, 243 (1988). "Because most publicly
available information is reflected in market price, an investor's reliance on any public material
misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action."  Id. at 247.
The fraud-on-the-market presumption of reliance is "based on the hypothesis that, in an open and
developed securities market, the price of a company's stock is determined by the available material
information regarding the company and its business . . . .  Misleading statements will therefore
defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."
Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999) (quoting Basic, 485 U.S. at 241-42).
"Thus, the presumption of reliance is available only when a plaintiff alleges that a defendant made
material representations or omissions concerning a security that is actively traded in an 'efficient
market,' thereby establishing a 'fraud on the market.'"  Id.  The presumption of reliance, however,
is rebuttable.  Basic, 485 U.S. at 248 ("Any showing that severs the link between the alleged
misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at
a fair market price, will be sufficient to rebut the presumption of reliance.").

average of 18.2 transactions during the 250 days in which he traded (which Mirsalimi refers to as "trading days"), including purchasing and selling Amarin securities within the same day.[5]  On these facts, Mirsalimi argues that Mirsalimi qualifies as a day trader, and relies on decisions from other courts that have been hesitant to appoint movants as lead plaintiff if that movant appears to be a day trader.

There is no formal definition of a day trader under the PSLRA, but courts analyzing similar claims have explained that day traders "typically focus on technical price movements rather than price," which could subject such a plaintiff to a unique defense that the plaintiff would have purchased the stock at issue regardless of the misstatement/omission of the defendant.  See In re Safeguard Scientifics, 216 F.R.D. 577, 583 (E.D.Pa. 2003) (finding lead plaintiff movant subject to unique defense that he would have made stock purchases regardless of omission because he was a day trader who also increased his holdings in the company's stock after disclosure of the alleged fraudulent omission).  This potential unique defense levied at a day trader plaintiff raises concerns of that plaintiff's adequacy and typicality.  See Applestein v. Medivation, Inc., 2010 WL 3749406 at *3 (N.D.Cal. Sep.20, 2010) ("a record of high-frequency and large trades can "raise serious concerns" about a lead plaintiff's typicality and "about his susceptibility to the defense that he was trading in response to information other than the alleged misstatements and omissions" of the defendant"); see also Bang v. Acura Pharm. Inc., 2011 WL 91099, at *6 (N.D. Ill. Jan. 11, 2011) ("unusually high-volume and high frequency trading can raise challenges to typicality and raise a unique defense regarding lack of reliance on material misstatements and omissions.").

---

[5]     Mirsalimi specifically points to transactions in Amarin securities by Reiss on December 9, 2010; January 31, 2010; February 3, 2011; March 29, 2011; April 26, 2011; July 7, 2011; March 2, 2012; June 4, 2012; June 27, 2012; July 10, 2012; September 13, 2012; and February 22, 2013.

The cases on which Mirsalimi relies for the proposition that Reiss should not be appointed

lead plaintiff because he is a day trader are not controlling on this Court and, further, for the reasons

explained below, are not persuasive.  Mirsalimi's principle case, Eichenholtz v. Verifone Holdings,

Inc., C07-06140MHP, 2008 WL 3925289 (N.D. Cal. Aug. 22, 2008) (finding group plaintiff

inappropriate lead plaintiff where group plaintiff relied upon daily market volatility, not upon

defendant company's financial statements), is an unpublished decision from the Northern District

of California.  Even if this case were persuasive when it was initially decided, the Northern District

of California has retreated from the Eichenholtz decision, more recently holding that "whether

[movant] is a day trader is inconsequential to his request to be appointed lead plaintiff."  In re

Zynga Inc. Sec. Litig., 2013 WL 257161, at *2 (N.D. Cal. Jan. 23, 2013); In re UTStarcom, Inc.

Secs. Litig., 2010 WL 1945737, at *7 (N.D. Cal. Jan 23, 2013) (further distinguishing Eichenholtz

because inter alia movant in that case submitted a declaration that he focused on publicly available

information in deciding to purchase defendant's stock with the goal of building a long term

position, which court held was sufficient to show him to be typical, notwithstanding whether he

could be labeled a day trader).[6]  Here, as in In re UTStarcom, although Reiss apparently engaged

---

[6]      The same holds true for Mirsalimi's reliance on Applestein v. Medivation, Inc., 2010 WL
3749406, (N.D. Cal. Sept 20, 2010), which also appears to be inconsistent with the Northern
District of California's more recent holdings in In re Zynga Inc. and In re UTStarcom.  In any
event, cases in Reiss' favor abound in the Northern District of California.  See, e.g., In Rieckborn
v. Velti PLC, 2013 WL 6354597, at *11 (N.D. Cal. Dec. 3, 2013) (appointing a lead plaintiff
movant despite claims that the movant was a day trader and an "in-and-out" trader who sold all of
their stock before the corrective disclosure; holding that the competing movant failed to offer
evidence, countering the extensive records provided by the lead plaintiff, that the trades were
indicative of day trading or in-and-out trading); Hodges v. Immersion Corp., 2009 WL 5125917,
at *3 (N.D. Cal. Dec. 21, 2009) (holding that the movant was not shown to have been subject to a
unique defense because the competing movant did not offer any evidence to support a finding that
the movant with the largest financial interest was a day trader; further, that even if he was a day
trader, no evidence was offered that his particular trading activities would subject him to a defense
that he would have purchased his shares regardless of the alleged fraud).

in an average of 18.2 transactions per <u>trading day</u>, Reiss has supplied a declaration that Amarin was Reiss' one and only "core" holding, and that he followed Amarin closely, including news items, SEC filings, conference calls, earnings announcements, and stock movements.  Reiss Reply Decl. ¶¶ 3-4.  Reiss claims that he relied on the truth and accuracy of the public statements made by and about Amarin, and did not trade based on small price movements.  <u>Id.</u> at ¶¶ 3-6.  As a result, I find that under <u>In re UT Starcom</u>'s reasoning, Reiss' claims are typical of the class, regardless whether he could be labeled a day trader.

Indeed, a variety of cases support appointing Reiss as lead plaintiff despite claims that he is a day trader.[7]  In <u>Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.</u>, 229 F.R.D. 395 (S.D.N.Y. 2004), the Southern District of New York noted that many courts differ as to whether a day trading operation or an in-and-out trader may serve as lead plaintiff in a standard securities fraud class action involving alleged fraud on the market.  In light of those varied holdings and the lack of any specific showing as to why day traders should be disregarded or discounted, those allegations were not sufficient to establish that the movant was subject to a unique defense.  <u>Id.</u> at 415.

More recently, in <u>Prefontaine v. Research in Motion Ltd.</u>, 2012 WL 104770 (S.D.N.Y. Jan 5, 2012), the Southern District of New York again held that the presumption of lead plaintiff was not rebutted as to the movant with the largest financial interest despite claims that he was a day trader.  In that case, the court noted that the prevailing view in the Second Circuit is that "day and

---

The only other meaningful case offered by Mirsalimi on the day trader issue is <u>Tsirekidze v. Syntax-Brillian Corp.</u>, 2008 WL 942273, at *4 (D. Airz. Apr. 7, 2008).  Like the cases from the Northern District of California, this case is unpublished and from a sister circuit.  Moreover, the <u>Tsirekidze</u> case can be distinguished because the court relied on additional concerns over the presumptive lead plaintiff's adequacy—beyond trading activity—to deny the motion, which concerns are not present in Reiss' case.

[7]       To be sure, I make no finding as to whether Reiss is or is not a day trader.

momentum traders have the same incentives to prove defendants' liability as all other class members, and their presence in a securities class does not create intra-class conflicts." Id. at *4 (citing In re Initial Public Offering Sec. Litig., 227 F.R.D. 65, 108 (S.D.N.Y. 2004), rev'd on other grounds).  In sum, the characterization that the movant was a day trader, without more, does not prove that he is subject to a unique defense, or rebut the presumption that the movant should be appointed lead plaintiff.  See id.

Similarly, in In re Host Am. Corp. Sec. Litig., 236 F.R.D. 102 (D. Conn. 2006), the District Court for the District of Connecticut rejected objections that the adequacy of the presumptive lead plaintiff based on allegations that it was a hedge fund and day trader, noting that many courts have concluded that the fact that a candidate for lead plaintiff engaged in day trading does not necessarily render that individual or entity atypical or inadequate at representing the class.  Id. at 108.  Specifically, the In re Host Am. Corp. court determined that "where the public market of a quoted security is polluted by false information … all types of investors are injured."  Id. (citing In re Oxford Health Plans, Inc. Sec. Litig., 199 F.R.D. 119 (S.D.N.Y 2001)).  The court was also persuaded by the presumptive lead plaintiff's explanation that it did not engage in over 9000 trades because it used an online discount brokerage implementing a technique it called "SmartRouting," which broke down a single large order into smaller lots and spread those orders across multiple market centers to achieve the best price for an order.  Id.  This conclusion undermines Mirsalmi's contention that Reiss is not an adequate lead plaintiff because of his high-volume trading history; like the presumptive lead plaintiff in In re Host Am. Corp., Reiss averred that he entered his transactions with his stock broker "at market," and that his larger orders were broken up into smaller transactions due to his broker's trading techniques.

Thus, although a few courts have held that the presumption of "most adequate plaintiff" is rebutted as to a plaintiff who could be characterized as a day trader, most other courts have found this not to be true.  At a minimum, the discrepancies among these cases show that such a determination is case-sensitive.  In that regard, I need not make a specific finding as to whether Reiss is a day-trader/in-and-out trader because, after reviewing the relevant law, I conclude that Mirsalimi has not rebutted Reiss' prima facie showing of adequacy.[8]  See, e.g., Prefontaine v. Research in Motion Ltd., 2012 WL 104770, at *4 ("Absent evidence to the contrary, the Court presumes that Shemian has the same incentive to prove defendants' liability as all other class members-whether or not he engaged in day trading. Accordingly, District 9's characterization of Shemian as a 'day trader' does not prove that Shemian is subject to a unique defense or rebut the presumption that Shemian should be appointed lead plaintiff.'" (citing In re Initial Public Offering Sec. Litig., 227 F.R.D. 65, 108 (S.D.N.Y. 2004), rev'd on other grounds, 471 F.3d 24 (2d Cir. 2006))).  Accordingly, I conclude that Reiss has made the requisite prima facie showing that he satisfies Rule 23's typicality and adequacy requirements, and Mirsalimi has failed to rebut that showing.  Thus, in line with the strictures of the PSLRA, Reiss shall be appointed lead plaintiff.

---

[8]     In addition to asserting that Reiss is a day trader, Mirsalimi also argues that Reiss should not be appointed lead plaintiff because Reiss is an in-and-out trader.  This assertion is not supported by the record.  In-and-out traders are those who both purchase and sell all of their shares prior to a corrective disclosure; if the purchaser sells shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342-43 (2005).  As a result, that purchaser would be atypical of the class and be subject to unique defenses regarding loss causation with respect to those shares.  Here, however, although Reiss completely divested his interest in Amarin ADRs twice in the first quarter of 2011, Reiss subsequently reinvested, and continued to invest, in Amarin, and had 685,000 ADRs at the end of the class period, at the time of Amarin's corrective disclosures.  As a result, Reiss is not an in-and-out trader.

**C.**     **Motion to Appoint Lead Counsel**

With regard to the selection of lead counsel, the PSLRA provides that "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." *Id.* § 78u–4(a)(3)(B)(v); see also In re Cendant Corp. Litigation, 264 F.3d at 222-23.

Lead Plaintiff Reiss has selected Wolf Popper LLP to represent him, and Cohn, Lifland, Pearlman, Herrmann, & Knopf LLP as liaison counsel, and seeks the Court's approval of those selections.  In support of that request, Robert C. Finkel, Esq., of Wolf Popper LLP has submitted a declaration setting forth his firm's experience as class counsel and attaching a resume of the firm, which references numerous class actions in which the firm has served as counsel.  Finkel Decl., Ex. B.  The Court finds that Wolf Popper LLP is well qualified to serve as lead counsel in the matter.  Further, the Court is familiar with Cohn, Lifland, Pearlman, Herrmann, & Knopf LLP, and finds that firm to be qualified to serve as liaison counsel.  Accordingly, Reiss' selection of Wolf Popper LLP as lead counsel, and Cohn, Lifland, Pearlman, Herrmann, & Knopf LLP as liaison counsel is hereby approved.

**CONCLUSION**

For the reasons stated above as well as on the record on July 24, 2014, the Court (i) consolidates the Sklar, Siegel, Bove, and Bentley Actions, (ii) appoints Reiss as lead plaintiff of the consolidated matter, and (iii) appoints Wolf Popper LLP as lead counsel, and Cohn, Lifland, Pearlman, Herrmann, & Knopf LLP as liaison counsel.

As appropriate Order will follow at a later date.

Date: July 29, 2014                                   /s/ Freda L. Wolfson
                                                     Hon. Freda L. Wolfson, U.S.D.J.

19